EFiled: Sep 28 2015 03:27PM EDT
Transaction ID 57930536
Case No. 5957-VCN

**IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE**

|  |  |  |
|---|---|---|
| STEWART MATTHEW, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | **C.A. No. 5957-VCN** |
| | : | |
| CHRISTOPHE LAUDAMIEL, | : | |
| FLÄKT WOODS GROUP SA, | : | |
| FLÄKT WOODS LIMITED and | : | |
| DREAMAIR LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |
| FLÄKT WOODS GROUP SA, | : | |
| | : | |
| Cross-Claim | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| CHRISTOPHE LAUDAMIEL, | : | |
| ROBERTO CAPUA, ACTION 1 SRL, | : | |
| and DREAMAIR LLC, | : | |
| | : | |
| Cross-Claim | : | |
| Defendants. | : | |

**MEMORANDUM OPINION**

Date Submitted: June 5, 2015
Date Decided: September 28, 2015

Thad J. Bracegirdle, Esquire of Wilks, Lukoff & Bracegirdle, LLC, Wilmington, Delaware, Attorney for Plaintiff.

Christopher Laudamiel, of New York, New York, Self-Represented Defendant.

Seth J. Reidenberg, Esquire of Tybout, Redfearn & Pell, Wilmington, Delaware and Mark Thornhill, Esquire, Kersten Holzhueter, Esquire, and Angus Dwyer, Esquire of Spencer Fane Britt & Browne LLP, Kansas City, Missouri, Attorneys for Defendants Fläkt Woods Group SA and Fläkt Woods Limited.

NOBLE, Vice Chancellor

Plaintiff, a businessman, aspired to create an innovative scenting business. He teamed with a perfumer and a financier in a limited liability company ("LLC"), which collaborated with an established company interested in integrating scenting technology into its commercial air handling systems. Developing a functioning product proved difficult, however, and interpersonal conflict further plagued the LLC. At some point, the perfumer and the financier began to seek support from an employee of the air handling company. The employee, who believed that the perfumer's skills were more valuable to the air handling company, participated in communication and meetings that excluded the businessman. Shortly after the perfumer and the financier voted to dissolve the LLC, they formed a new, similar company and ultimately contemplated working with the employee and the air handling company in a similar capacity. The businessman responded with this action asserting direct and indirect claims relating to the failed business. The Court sets forth its findings of fact and conclusions of law in this post-trial memorandum opinion. For the reasons below, the Court finds that the perfumer is liable for his conduct, the air handling company lacked the requisite scienter to participate in the wrongful conduct or cause independent injury and thus has no liability, and an award of $491,839.79 from the perfumer and the entity he controls, subject to resolution of one remaining issue, fairly compensates the businessman.

1

# I. BACKGROUND

A. *The Parties*

Plaintiff and Counterclaim Defendant Stewart Matthew ("Matthew") was a manager of Aeosphere LLC ("Aeosphere" or the "Company") and held 35% of its membership units.[1] He maintains this action against Defendant and Counterclaim Plaintiff Christophe Laudamiel ("Laudamiel"), as well as Defendants DreamAir LLC ("DreamAir"),[2] Fläkt Woods Group SA ("FWGSA"), and Fläkt Woods Limited ("FWL") to vindicate his rights following Aeosphere's dissolution. The liability of Roberto Capua ("Capua"), Capua's investment vehicle Action 1 SRL ("Action 1"), and SEMCO LLC ("SEMCO"), named in Matthew's original complaint, is no longer at issue.

Matthew, Laudamiel and Action 1 were Aeosphere's members, and Matthew, Laudamiel and Capua were Aeosphere's managers.[3] Laudamiel, like Matthew, held 350 common units of Aeosphere (35% of the fully diluted total), and Capua held 300 preferred units of Aeosphere (30% of the fully diluted total).[4] Laudamiel and Capua formed DreamAir on May 7, 2010, shortly before Matthew

---

[1] Joint Pre-Trial Stipulation and [Proposed] Order ("Stip.") § II ¶¶ 2-3; JX 230 ("LLC Agreement") at A-1 (showing the members' interests).
[2] Default judgment has been entered against DreamAir; only the amount of damages remains, and that question is resolved in this memorandum opinion because the liability of Laudamiel and the liability of DreamAir are the same.
[3] Stip. § II ¶¶ 2-3.
[4] LLC Agreement A-1.

filed Aeosphere's certificate of cancellation.[5] FWGSA "provides management services and contracts for management services for the Fläkt Woods family of companies,"[6] including FWL, a United Kingdom entity. For convenience, the Court does not distinguish between FWGSA and FWL. A critical part of FWGSA's business is the manufacture and sale of air handling units.[7]

B. *The Creation of Aeosphere*

Aeosphere originated as an entertainment company founded by Matthew to develop a project called the Scent Opera.[8] The Scent Opera involved presenting a story through scents and sounds and would eventually yield performances at prominent museums.[9] Although Laudamiel initially was not interested in forming a business with Matthew, he agreed to create the fragrances for the Scent Opera.[10] To obtain funding for his project, Matthew made a number of "cold call[s]," one of which was to FWGSA.[11] As the discussions progressed, Matthew worked primarily with Neil Yule ("Yule"), then responsible for various business

---

[5] JX 240 (details of DreamAir LLC); JX 405 (Aeosphere's certificate of cancellation); Trial Tr. vol. III, at 737 (Laudamiel).
[6] Stip. § II ¶¶ 5-6.
[7] Trial Tr. vol. II, 388 (Yule).
[8] Trial Tr. vol. I, 20-23 (Matthew).
[9] *Id.* at 16-18 (Matthew). Scent Opera performances were given at the Guggenheim Museums in New York and Bilbao, Spain.
[10] *Id.* at 20-21 (Matthew).
[11] *Id.* at 21-22 (Matthew).

development projects at FWGSA.[12] Yule saw an opportunity for FWGSA to use scenting technology with its air handling units to offer an "aroma-control and fragrancing" system.[13] This Scent Project intrigued Yule because it would allow FWGSA to differentiate its business in a "mature industry with a lot of competition."[14]

The discussions culminated in the formation of Aeosphere, with Matthew and Laudamiel as co-CEOs, and the execution of the Operating Agreement of Aeosphere LLC dated June 20, 2008.[15] Aeosphere entered into a Collaboration Agreement with FWGSA on July 2, 2008.[16] The Collaboration Agreement broadly anticipated Aeosphere developing proprietary scent formulas, another company providing the scented oils, and FWGSA marketing and supplying the "integrated package . . . for incorporation into new or existing air handling equipment designed to ensure the controlled diffusion of the selected scent into selected areas of space."[17]

---

[12] *Id.* at 22-23 (Matthew); Trial Tr. vol. II, 390-91 (Yule).

[13] JX 1 at FWGSA_000020 (describing the scope of the Collaboration Agreement).

[14] Trial Tr. vol. II, 388-89 (Yule).

[15] *See* JX 435 (original operating agreement).

[16] JX 1 (Collaboration Agreement). The original collaboration agreement was amended in March and April 2009. Stip. § II ¶ 8; JX 6 (April amendment).

[17] JX 1 at FWGSA_000020-21.

The parties disagree about whether they based their agreement on the use of electric field effect technology ("EFET"), developed by Battelle Memorial Institute ("Battelle"), to transform scent oils into particles that could be dispersed by the air handling units. It is clear, however, that the parties saw EFET as the best option in terms of both function and profitability.[18] While a device developed by Prolitec, Inc. ("Prolitec") existed as a prospective alternative to EFET, the Prolitec device did not perform as well as claimed[19] and use of such device would mean collaborating with an FWGSA competitor.[20]

Yule presented the Scent Project to FWGSA, but FWGSA did not adopt the project because of the costs associated with developing the technology, among other reasons.[21] Aeosphere eventually found a source of funding in Capua, who provided €1.55 million through Action 1.[22] In return, Action 1 received a 30% membership interest in Aeosphere[23] and Capua became a manager.[24] Part of the effort to attract Capua's investment involved Matthew's preparation of pro forma

[18] *E.g.*, JX 4 (email from Matthew to Yule discussing scenting technologies); JX 154 (comparing EFET technology to Prolitec technology); Trial Tr. vol. II, 428-29 (Yule).

[19] JX 115 at FWGSA 016470; Trial Tr. vol. II, 395-96 (Yule).

[20] Trial Tr. vol. II, 392 (Yule).

[21] *Id.* at 391 (Yule); Trial Tr. vol. III, 776 (Margrita) (discussing sundry financing issues).

[22] Dep. Trs. of Roberto Capua, vols. I and II ("Capua Dep.") 148; LLC Agreement B-1. Matthew suggested that the actual investment was less. Trial Tr. vol. I, 58-59, 74 (Matthew) ("[A]s I recall, it was 1.4 million euros.").

[23] LLC Agreement A-1.

[24] Stip. § II ¶ 3; LLC Agreement A-1.

5

financials projecting that FWGSA would sell 15,100 scenting devices by the end of 2013 (and 2,200 by the end of 2010).[25]

Under Aeosphere's LLC Agreement, certain actions, such as terminating Matthew and winding up Aeosphere, required a unanimous vote of the co-CEOs, though Capua negotiated other meaningful voting rights.[26] Generally speaking, Capua's investment came with a "preferred return" of 7% (compounded annually) on "outstanding and unreturned . . . Capital Contributions" and priority in distributions of available cash and liquidation proceeds.[27] The new arrangement was reflected in the LLC Agreement, dated as of May 11, 2009. Matthew and Laudamiel's employment agreements appeared as attachments to the LLC Agreement.[28] Each had a term of five years, with a base salary equivalent to $300,000 in the first year and $350,000 per year thereafter.

Around March 2009, with news of Capua's investment, Yule updated projections and pitched the Scent Project once more.[29] At about the same time, FWGSA contracted with Battelle for an option to license the Battelle technology,[30] and the Collaboration Agreement was amended to increase royalties on sales "[i]n

---

[25] JX 239 at LCA 002597; Trial Tr. vol. I, 124-25 (Matthew).
[26] *See Matthew v. Laudamiel*, 2012 WL 2580572, at *8 (Del. Ch. June 29, 2012) (interpreting § 5.2.6 of the LLC Agreement).
[27] LLC Agreement §§ 1.1, 4.1, 6.1, 9.4.
[28] *Id.* at E-1-2.
[29] Trial Tr. vol. II, 393, 397 (Yule); *see also* JX 115 (updated PowerPoint).
[30] JX 5 (agreement between Battelle and FWGSA).

return for [Aeosphere's] co-investment with FWG[SA]" in the technology contemplated by the License and Development Agreement with Battelle.[31] The assumption of using EFET was "significan[t]" to Yule's projections that 2010 sales would reach around €2.6 million.[32] Yule claims that his projection would have been at best one-fifth to one-tenth of that had the Prolitec technology been used.[33] Jean Philippe Margrita, who became FWGSA's senior vice president of marketing and product development in late 2008,[34] was somewhat skeptical of Yule's numbers; he believed that it would take over a year to begin selling units using EFET.[35] FWGSA adopted the Scent Project as one of its initiatives but used a more conservative projection of €500,000 in 2010 sales (later updated to €200,000 in forecasted sales) in seeking shareholder approval of the November 2009

---

[31] JX 6 at FWGSA_000014. Matthew, however, protests that "payment of royalties to Aeosphere was never tied specifically to sales of equipment using EFET." Pl.'s Post-Trial Reply Br. 7. The amendment also provided that Aeosphere would "remain exclusive designer and supplier of scented media to all FWG[SA] equipment and systems for a period of 10 years" if FWGSA did not execute the agreement with Battelle. JX 6 at FWGSA_000014.

[32] JX 141; Trial Tr. vol. II, 427-28 (Yule). The parties debate whether Yule's projections were "cautious" (as Yule wrote in a contemporaneous email to Matthew), JX 141, or if they were the product of a salesman trying to pitch a project. *See* Trial Tr. vol. II, 413-14 (Yule). The Court addresses the reliability of the various projections in its discussion of damages, *infra*.

[33] Trial Tr. vol. II, 428 (Yule). The figures would have been even less if FWGSA did not acquire exclusive rights to the Prolitec technology. *Id.*

[34] Trial Tr. vol. III, 767 (Margrita).

[35] *Id.* at 792-94 (Margrita) (elaborating, for example, that "it will have been at least three month[s] for the prototype, another probably six, seven months to realize the product, then another probably three month[s] to test it").

7

budget.[36]    The presentation noted that the FWGSA "device [was] not yet completed" but anticipated using Prolitec technology in the meantime.[37] Unfortunately, even the updated numbers proved too optimistic.

C. *The Conflict and Yule's Involvement*

As Aeosphere struggled, conflict arose within the Company's management, including Laudamiel's desire to bring his husband, perfumer Christophe Hornetz ("Hornetz"), into the business as an employee,[38] and certain conduct during the Scent Opera engagements.[39]    As to be expected with disagreements and secret negotiations, the record does not paint a clear picture of who was planning to do what, and when.  A few records and acts, however, are particularly noteworthy and illustrate the timeline of the managers' negotiations and the ultimate dissolution.

---

[36] JX 270 at FWGSA 098985; JX 271 at FWGSA 029973; Trial Tr. vol. IV, 874-75, 885, 887-89 (Margrita).  During post-trial oral argument, counsel for the Fläkt Woods parties stated that the €200,000 number was the only number presented to shareholders.  Post-Trial Oral Arg. Tr. ("Oral Arg. Tr.") 95.  *See* Trial Tr. vol. IV, 880 (Margrita) (explaining that most orders result in sales).
[37] JX 271 at FWGSA 029973.
[38] *E.g.*, Trial Tr. vol. I, 80-82, 93 (Matthew).
[39] *See* Trial Tr. vol. IV, 815-16, 836 (Laudamiel).  For example, Laudamiel felt hurt when Matthew yelled at him, publicly, at one venue.  Trial Tr. vol. IV, 815-16 (Laudamiel).  The Court does not know the full extent of these tensions and only raises them for context.  The Court will not speculate on matters for which it does not have a factual basis.

Around September 2009, Matthew, Laudamiel, and Capua began to discuss restructuring their roles within Aeosphere.[40] Records from October confirm pre-existing strife and a desire to exclude certain members from communication. In one email chain, Laudamiel expressed concern about Matthew holding up a project, and Yule suggested fabricating a scheduling conflict as a ruse to keep Matthew out of a meeting they felt unnecessary.[41] In a follow-up email, Yule asked Laudamiel about the "possibility that [Matthew] could gain access to [Laudamiel's] mails through the Aeosphere server."[42] Laudamiel and Yule discussed business opportunities without informing Matthew into November.[43] Matthew, too, solicited Capua's help to prevent Laudamiel from "hav[ing] his own way all the time."[44]

---

[40] Trial Tr. vol. I, 92-94, 162-63 (Matthew). One option placed Matthew "as the sole CEO," a suggestion that Matthew declined as unacceptable to Laudamiel. *Id.* at 94 (Matthew).

[41] JX 120 at FWGSA 008502-03 (October 22-23 emails).

[42] *Id.* at FWGSA 008502 (October 23 email from Yule to Laudamiel). Yule's concern about security is also reflected in a later instruction to another FWGSA employee to email Laudamiel at his personal address. JX 155 at FWGSA 009300 (March 2010 email).

[43] *E.g.,* JX 120 at FWGSA 008503 ("[I]f I show [Matthew] all the details, the project will be stopped every second week."); JX 143 (Yule mediating communication between a client and Laudamiel); Trial Tr. vol. III, 573-74 (Yule) (discussing a proposal sent by Yule "on behalf of Christophe Laudamiel of Aeosphere and of Flakt Woods Group.").

[44] JX 227 at LCA000001 (October 21 email from Matthew to Capua).

Laudamiel and Capua then held a secret meeting with Yule in Paris. During that January 2010 meeting, the three discussed the conflict within Aeosphere and Capua's desire "to place the business into . . . different business streams to . . . allow [Matthew] and [Laudamiel] to operate in their preferred areas and . . . avoid some of the conflict."[45] Yule claims that he did not know that Laudamiel and Capua wanted to discuss a potential division; he had believed the meeting was to visit a site for a Scent Opera performance and a center for perfumery.[46] He admits, however, that he had known as early as fall 2009 that the managers were considering "some sort of reorganization."[47] Yule agreed to keep the meeting confidential.[48] Laudamiel and Capua likely did not inform Matthew of the meeting,[49] although Capua did inform Matthew that he had discussed the

---

[45] Trial Tr. vol. II, 451 (Yule); *accord* Trial Tr. vol. III, 579 (Yule).

[46] Trial Tr. vol. II, 450-51 (Yule); *see also* JX 144 at FWGSA 008872 (explaining a wish to take Yule to two places in Paris).

[47] Trial Tr. vol. III, 563 (Yule).

[48] *See* JX 145 at LCA 024939 ("If and when you decide to tell [Matthew] that we have met, then please let me know straight away so that I am aware."). In the same email, Yule forwarded a marketing plan that he thought was an effort by Matthew "to establish his position in the relationship and to be seen to be the person driving the agenda forward." *Id.* While Matthew highlights Yule's conduct in this instance, the communication also implies one-sided contact by Matthew. *Id.* at LCA 024939-40 (Jan. 7, 2010 email from Matthew to Yule).

[49] *See* Capua Dep. 120; JX 146; Trial Tr. vol. III, 698-99 (Laudamiel) (stating that he has "no idea" whether Matthew was ever told of the Paris meeting).

management problems with Yule at some point.[50]  The evidence suggests that Matthew did not authorize his co-members to discuss the internal separation discussions with Yule and attempted to keep them confidential himself.[51]

Adding to the tension was a string of disappointing test results.  Matthew highlights a failed round of testing, of which Yule notified Laudamiel and Capua on January 21, 2010.[52]  In his email, Yule suggested,

> One option is for you guys to use the EF[E]T option as a bargaining chip in your negotiations with [Matthew].  If we agree that it is not a suitable technology for HVAC applications, then perhaps you should offer the license to [Matthew] as his share of Aeosphere, allowing him to leave without the need for an additional financial pay-off?[53]

The next day, in response to emails from Capua about conflict with Matthew, Yule expressed his "100% commit[ment]" to Laudamiel and Capua.[54]  He not only agreed to conceal his knowledge of "how serious matters had become"[55] but also

---

[50] *See* JX 7 at SM046307 (email from Matthew to Capua stating that "your . . . disclosure to [Yule] of a rift in Aeosphere destabilised his trust in the Flakt Woods Aeosphere arrangement").

[51] *See, e.g.*, *id*. at SM046307-08; JX 41; JX 42 at SM031527; JX 150 at FWGSA 009058.

[52] JX 147 at LCA 025266.

[53] *Id.*  Matthew observes, however, that residential and consumer applications were not part of the license agreement and therefore could not be used as a "bargaining chip."  Pl.'s Post-Trial Reply Br. 18 (citing, for example, JX 5).

[54] *See* JX 148 at FWGSA 008960.

[55] *Id.* at FWGSA 008963.  In feigning ignorance of Capua's "divorce arrangement," Yule "instead spoke as if the Aeosphere team were simply evaluating [a] different business structure for the future which might involve [Matthew] leaving Aeosphere to form a new venture[], which would still work closely with Aeosphere and FW[GSA]." *Id.*

11

represented that "[a]ny contact [he may] have with [Matthew] during this time will purely be on the basis that it may help [Laudamiel and Capua]."[56] Yule admits that he favored Laudamiel (and Capua), as Laudamiel's skills were more valuable to the business arrangement (at least going forward).[57] At the same time, he intended to "remain[] entirely impartial with regard to Aeosphere's internal structural review."[58] In Yule's words, "the ideal scenario" for FWGSA would have been for Aeosphere to have two divisions, one with Matthew developing new media projects and one with Laudamiel working on ambient scenting.[59]

By February 2010, if not earlier, the managers had retained counsel and were discussing a separation of business activities.[60] On February 3, Capua asked Matthew to "discuss our members['] current situation during our meeting," adding that "[b]asically we are in agreement almost in everything[, though] we must deal with your proposal of split job and exclusivity."[61] In that email chain, Capua refers

---

[56] *Id.* at FWGSA 008960.

[57] Trial Tr. vol. III, 592-93 (Yule).

[58] JX 150 at FWGSA 009057 (Jan. 28 email from Yule to Matthew); *see also* Trial Tr. vol. II, 474-75 (Yule).

[59] Trial Tr. vol. II, 476 (Yule); *see also id.* at 452-53 (Yule) ("I said if [Capua] can find a way to allow [Matthew] and [Laudamiel] to work in their different areas and Flakt Woods to continue to have . . . a good and hopefully a better working relationship, then I've got no concerns about that.").

[60] Capua Dep. 37-38; Trial Tr. vol. I, 160 (Matthew).

[61] JX 28 at SM046427. Just one day earlier, Yule wrote Laudamiel and Capua about working with a chef—an opportunity that would not exist as long as Matthew remained their business partner. JX 113 at FWGSA 009094 ("As soon as [Matthew's] exit from Aeosphere has been confirmed, we should very quickly re-

12

to "the split of the company we are evaluating," explaining that he "do[es] not trust [Matthew] anymore," and ends that he will "see if [he] can r[e]cover some money from this terrible investment."[62]  Thereafter, the managers had a board meeting, which ended in frustration,"bang[]ing doors" and a hasty exit by Matthew.[63]  They were unable to agree on a budget.[64]  A follow-up email from Matthew to Capua states, "I cannot agree to a discussion of budget limited to a two to three months time horizon.  Our company could face financial ruin in the meantime unless we set a responsible budget."[65]

In contrast, discussions among Laudamiel, Capua, and Yule continued. Matthew focuses on a number of exchanges over the next few months.  For example, Yule, Laudamiel, and Capua held a February 24 conference call to discuss EFET and Prolitec.[66]  At that point, Laudamiel believed that EFET was still a viable option.[67]  Emails from March 8 through 9 discuss pursuit of EFET and working without interference from Matthew.[68]  Capua explained that they "finally

---

establish the connection with [the chef]."). Yule knew that Matthew had interpersonal conflicts with the chef.  Trial Tr. vol. III, 605-06 (Yule).
[62] JX 28 at SM046427.
[63] JX 236 at LCA 027110.
[64] *Id.*
[65] *Id.* at LCA 027111.
[66] *See* JX 153; JX 154.
[67] Trial Tr. vol. III, 700 (Laudamiel).
[68] JX 156.  One email from Yule to Laudamiel suggested a call to discuss test results and options with Capua and Laudamiel, to be followed by a separate call involving Matthew.  *Id.* at FWGSA 009369-70.

reached a preliminary agreement [to] have [Matthew] out of the company at least for management and decision making" but retaining a "20% share."[69] At the end of March, Yule told a third party (then in negotiations with FWGSA and Aeosphere) about the management dispute and that Laudamiel and Capua "are close to concluding a deal that will result in [Matthew] leaving the firm in the next few weeks."[70] Though his testimony was not completely consistent, Yule stated in his deposition that he understood the negotiations to be confidential.[71] He told the third party contact, "[Matthew] is not aware that you and I have already spoken and I would prefer to maintain that impression during our call."[72]

Regardless whether the conflict was a result of mutual negotiation (as alleged by Defendants) or a conspiracy to oust him (as alleged by Plaintiff), April emails reflect growing pressure on Matthew to resolve the conflict. On one hand, the correspondence appears to show some movement toward an arrangement where the co-CEOs could avoid deadlock, such as by making Capua the new CEO and allowing Matthew and Laudamiel to pursue their respective fields.[73] In one

---

[69] *Id.* at FWGSA 009371.

[70] JX 157 at FWGSA 009532.

[71] *See* Trial Tr. vol. III, 613-14 (Yule); Dep. Trs. of Neil Yule, vol. II 455.

[72] JX 157 at FWGSA 009532.

[73] *See* JX 29 at SM035389 (April 7 email from Capua to Matthew stating that "[counsel] informed me about your decision [to] quit any negotiation for our new agreement. Of course I was very disappointed especially considering all that we have achieved . . . in order to fix our current management situation and start working to make [A]eosphere start in a good way."); JX 31 at SM052299 (April 9

14

chain dated April 13, Capua explained that he was "done on financing [A]eosphere unless thing[s] change[d]" but that he was "trying the impossible to fix th[e] company."[74] Around one week later, Capua told Matthew that "[i]f everything is ok we can meet to finalize and sign [documents]" after discussing a "few little points."[75]

On the other hand, there is ample evidence that Matthew saw only part of the picture. Notably, Laudamiel suggested on April 22 that Yule send an email, during the period of negotiations, to help his ability to work free from Matthew's "manipulations and . . . arrogance."[76] Laudamiel's suggestion resulted in an email (also dated April 22) in which Yule stated, "I am fearful that unless matters are quickly resolved, then I will be told to wind up [FWGSA's] involvement in the scent project."[77] Matthew promptly followed up with a private phone call to

---

email from Capua to Matthew suggesting that Capua become CEO and that they "continue [their] negotiation, or [Capua will] have to direct [his] legal advisor for another type of strategy and war.").

[74] JX 33 at SM052263-64.

[75] JX 34.

[76] JX 122 at FWGSA 009915.

[77] JX 37 at SM052245. Yule's email incorporates a significant portion of Laudamiel's draft. For example, Yule wrote,

> Without wishing to interfere in internal Aeosphere matters, you will understand I am sure that . . . it is important for me to have some clarity. The clock is ticking and I am fearful that unless matters are quickly resolved, then I will be told to wind up our involvement in the scent project. So if you could provide me with a little information, I would be grateful.

Yule[78] and an email request that Yule "consider sending a follow up message" that properly reflects his value to Aeosphere.[79] The next day, Matthew emailed Capua to "terminate discussions of an alternative arrangement, unless it were to buy you and Christophe out of the company."[80] At this point (or shortly thereafter), Defendants say, the communication broke down.[81]

---

> It is also clear that the internal issues are becoming increasingly apparent to our other partners. The guys at Battelle have made several informal comments to me, such as "the guys at Aeosphere seem to have lost interest" and "Christophe's lost his fire[.]"[] Christophe – they have always placed great store on your reputation and expertise . . . .

*Id.* Laudamiel's suggestion was,

> Without of course interfering in internal Aeosphere matters[], you will understand that the special position of [FWGSA] makes me nervous not to hear a new plan when the clock is ticking, so if you could provide me with a little information, I would be very grateful.
>
> Know also no matter how hard you try to conceal it, people such as Battelle did feel something was not going round in the past phone conferences, for instance that Christophe is losing his usual passion and flame, and that worries people because this is key for Aeosphere.

JX 122 at FWGSA 009916.

Matthew points out that the Collaboration Agreement did not allow FWGSA to terminate for ten years—although winding up Aeosphere presented another way out. Pl.'s Opening Post-Trial Br. 14 n.7.

[78] Trial Tr. vol. II, 488-89 (Yule).

[79] JX 38.

[80] JX 42 at SM031529.

[81] Capua Dep. 154-55 ("[A]fter [Matthew] . . . closed down the negotiations with no reason to me. . . . I decided this was the only solution."); *see also* Trial Tr. vol. IV, 836-37 (Laudamiel) (describing the period around April 22 and explaining that he and Capua "were running out of solutions, suggestions, to Mr. Matthew"); Oral Arg. Tr. 67-69, 76-77.

16

Capua and Matthew exchanged a few emails after April 23, in which Matthew reminded Capua that they "have responsibility to act according to [their] company's amended operating agreement."[82] Laudamiel forwarded Yule certain April 23 emails sent by Matthew rejecting Capua's suggestion to become CEO— apparently at Yule's request[83] and against Matthew's instructions about confidentiality.[84] On April 27, Yule sent an email to Matthew making clear that FWGSA considered Laudamiel the critical business partner and that he needed to inform his board of the conflict.[85] That email expressed a hope that "peace" would be achieved but also "implore[d] [Matthew] to quickly identify a way in which the business can be divisionalised or if necessary separated, in order for all parties to move forward."[86] Yule hoped the email would be helpful to Laudamiel and Capua,[87] but did not discuss his concerns with Margrita.[88] In an April 29 reply, Matthew explained to Yule that Aeosphere, as a team, was committed to working with FWGSA.[89]

---

[82] JX 42 at SM031528.

[83] JX 123 at FWGSA 009985. Yule did not "recall having any concern about confidentiality at the time." Trial Tr. vol. III, 619-20 (Yule).

[84] JX 123 at FWGSA 009986.

[85] JX 44 at FWGSA 066884.

[86] JX 124 at FWGSA 010053.

[87] *Id.*

[88] Trial Tr. vol. IV, 932-33 (Margrita).

[89] JX 125.

Capua claims that he consulted counsel and decided, around May 3, to hold an emergency meeting on May 4 to wind up the company.[90] Yet on April 28 and 29, Laudamiel wrote emails to Yule discussing a "Commando Operation" and "DDay."[91] It is equally clear that Laudamiel was anticipating an important event (at a minimum, withdrawing money from Aeosphere's bank accounts[92]) and that Yule had no idea what Laudamiel meant.[93] On April 29 and 30, Laudamiel took over $145,000 from Aeosphere's account, of which $70,000 was distributed to Action 1.[94] Matthew was only given a day's notice of the emergency meeting.[95] Attached to the email notice was an agenda setting forth dissolution and winding-up as the top item on the list.[96]

Matthew did not attend the May 4 meeting.[97] Regardless, Laudamiel and Capua took a vote "to cease operations, wind up the affairs of the Company and

---

[90] *See* Capua Dep. 150-51 (explaining that he spoke with counsel before making his "decision to call th[e] meeting" and that he "probably" did not know about calling the meeting until May 3).

[91] JX 158 at FWGSA 010215.

[92] Laudamiel admitted that he knew of the emergency meeting and dissolution vote by (at least) late April or early May. *See* Trial Tr. vol. III, 721-24 (Laudamiel). The Court notes that Laudamiel and Capua could, in theory, vote on the matter without violating the LLC Agreement; it was the subsequent action in accordance with the non-unanimous vote that breached the LLC Agreement.

[93] *See* Trial Tr. vol. II, 505-06 (Yule); Trial Tr. vol. III, 707, 756-57 (Laudamiel).

[94] JX 111; Trial Tr. vol. III, 707, 709-11, 715-20 (Laudamiel).

[95] JX 109 (email about the emergency meeting); JX 110 (noting that Matthew had "acknowledged receipt of" the information).

[96] JX 109.

[97] JX 110 at LCA 001576.

dissolve as soon as is practical in order to preserve important Company rights and avoid further Company liabilities."[98]   Votes were taken to terminate Matthew's employment, and Laudamiel was placed in charge of overseeing Aeosphere's winding up and liquidation.[99]  Capua understood that he was putting himself at risk of a lawsuit for breach of the LLC Agreement.[100]  Laudamiel also understood that Matthew had some rights under the LLC Agreement.[101]   In letters of that same date, Laudamiel assigned himself equipment in the Berlin office and "scents, scent formulas, scent conventions and annotations and test designs" and assigned Matthew equipment in the London office and "rights to the libretto of the ScentOpera 'Green Aria.'"[102]

Laudamiel emailed Yule that same day, informing him that it was "GAME OVER" and that he and Capua would soon "be back up and running, AND FREE."[103]  The next day, Yule emailed Battelle to assure it of FWGSA's continued "commitment to the development of scenting solutions for HVAC applications."[104] By that time, FWGSA and other entities with business ties had received notice that

---

[98] *Id.*
[99] *Id.* at LCA 001576-77.
[100] Capua Dep. 166-68.
[101] *See* Trial Tr. vol. III, 704-05 (Laudamiel).
[102] JX 110 at LCA 001580-81.
[103] JX 126.
[104] JX 159 at FWGSA 010272 ("Please be aware that this has no impact on Fläkt Woods' commitment to the development of scenting solutions . . . .  I do not expect it will be long before Christophe is once again in a position to lend his technical and creative support to this process.").

Aeosphere was in the process of winding up.[105] Yule explained at trial that he sent this email because he was interested in "a license that [he] may be able to sell to somebody else."[106] However, Matthew observes that there were contractual barriers, including Battelle's consent and potential rights of Aeosphere.[107] Laudamiel formed DreamAir on May 7, but must have planned for this entity in advance, judging from the documents filed that day.[108] On May 10, Matthew emailed Yule to inform him that "[Matthew's] partners in Aeosphere LLC[] have taken steps to dissolve the company" unlawfully and that he intended "to protect [his] rights and interest."[109] Laudamiel caused the filing of Aeosphere's certificate of cancellation on May 12, 2010[110] and forwarded a copy to Yule.[111] At the time of dissolution and winding up, Aeosphere had $21,000 in its bank account.[112]

D. *Post-Winding Up Events*

One day after receiving the certificate, Yule informed Battelle that he invited Laudamiel (who "remain[ed] a passionate supporter of EF[E]T") and Capua to join

---

[105] *See id.* at FWGSA 010272-73.
[106] Trial Tr. vol. III, 626 (Yule).
[107] Pl.'s Opening Post-Trial Br. 22 (citing JX 5 at FWGSA_000007, FWGSA_000009; JX 6 § 4).
[108] JX 240; Trial Tr. vol. III, 737-45 (Laudamiel) (questioning Laudamiel about the events surrounding the filing).
[109] JX 48 at FWGSA 096730.
[110] JX 405.
[111] JX 129 (informing Yule that "[t]he Dissolution documents were signed yesterday and filed today with the State of Delaware").
[112] *See* JX 434 at Schedule 7 (closing balance sheet).

20

their conference call regarding EFET.[113]  The email expressed a willingness of Capua and Laudamiel to fund further testing efforts, including by sending a Battelle engineer to FWGSA's testing facility in Sweden.[114]

The next set of communication Matthew highlights involves a July 28 email from Capua seeking clarification on the business relationship between DreamAir and FWGSA: "[W]e really need to understand how our relationship is going to start."[115]  He continued, "I know that you are very busy in more important issue[s] that involve your company but please do not forget about us."[116]  Yule replied that his "assumption has been that DreamAir will simply inherit the terms of the agreement previously in place with Aeosphere" but that "[a]s [they] will initially be primarily working with the Prolitec equipment, [FWGSA's] margins will be far smaller."[117]  Yule sent DreamAir a draft Collaboration Agreement in October 2010[118] and encouraged Laudamiel to sign.[119]  Changes included provisions allowing them "to revisit all of the substantive clauses at a later date."[120]  They

---

[113] JX 161 at FWGSA 010391.
[114] *Id.*; Trial Tr. vol. III, 747 (Laudamiel).
[115] JX 162 at FWGSA 010618.
[116] *Id.*
[117] *Id.* at FWGSA 010617.
[118] *See* JX 163 (draft agreement).
[119] JX 168 at FWGSA 007007; Trial Tr. vol. III, 642 (Yule).
[120] Trial Tr. vol. III, 679-81 (Yule); *see also* JX 163 at FWGSA 003692-93.

never formalized the contract.[121]  Ultimately, DreamAir sold Prolitec units and Prolitec scents.[122]

E. *Procedural Posture*

This litigation has a long history.  Matthew filed his original claim in November 2010 against Laudamiel, Capua, Action 1, FWGSA, and SEMCO.[123]  In February 2012, the Court dismissed claims against SEMCO and FWGSA for lack of personal jurisdiction and certain counterclaims filed by Laudamiel, Capua, and Action 1.[124]  The Supreme Court later reversed that decision in part, finding that the Court had personal jurisdiction over FWGSA based on the conspiracy theory of personal jurisdiction.[125]  Matthew added DreamAir and FWL in later amended complaints.  He moved for partial summary judgment on claims for breach of the LLC Agreement and conversion, which led to a June 2012 opinion generally denying the motion.[126]  However, the Court explained that, "unless the Manager Defendants prevail on one of their affirmative defenses or Matthew is unable to prove that he suffered any damages, [Laudamiel and Capua] will be liable for a

---

[121] Trial Tr. vol. II, at 529-31 (Yule).

[122] *See* JX 199 (sales summary); Trial Tr. vol. III, 758 (Laudamiel) ("We were nowhere near, and I want to say one or two years away from actually having a [custom] scent sold in a Prolitec device.").

[123] Verified Compl. ¶¶ 7-11.

[124] *Matthew v. Laudamiel*, 2012 WL 605589 (Del. Ch. Feb. 21, 2012); *see also Matthew v. Laudamiel*, 2012 WL 983142 (Del. Ch. Mar. 20, 2012), *rev'd sub nom. Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023 (Del. 2012).

[125] *Matthew v. Fläkt Woods Gp. SA*, 56 A.3d 1023 (Del. 2012).

[126] *Matthew v. Laudamiel*, 2012 WL 2580572 (Del. Ch. June 29, 2012).

22

breach of § 5.2.6(b)(iii) of the LLC Agreement" by winding up Aeosphere without Matthew's approval.[127]

Capua and Action 1 reached a settlement with Matthew, and all relevant claims against them were dismissed with prejudice in April 2014.[128] One condition of the settlement was Capua's agreement to cease funding Laudamiel and DreamAir's legal representation.[129] Counsel for Laudamiel withdrew as of April 10, 2014,[130] and Laudamiel proceeded as a self-represented litigant. One month later, the Court granted default judgment against DreamAir.[131] Before trial, the Court granted summary judgment on one of Laudamiel's counterclaims, finding that Matthew had not materially breached the LLC Agreement.[132] The Court granted FWGSA's motion for summary judgment on Matthew's unjust enrichment claims but denied the attempt to dismiss the other claims against FWGSA.[133]

[127] *Id*. at *8.

[128] Stipulation and [Proposed] Order of Partial Dismissal, Apr. 10, 2014.

[129] *See* Mot. of Defs. Christophe Laudamiel, Roberto Capua, Action 1 SRL, and DreamAir LLC to Withdraw Appearances of Their Att'ys of Record and for Stay of Case Management Schedule ¶ 3, Mar. 21, 2014.

[130] Order Granting Mot. to Withdraw Appearances of Gregory V. Varallo and Kevin M. Gallagher of Richards, Layton & Finger, and Roger E. Barton and Randall L. Rasey of Barton LLP, Apr. 10, 2014.

[131] *Matthew v. Laudamiel*, 2014 WL 2152353 (Del. Ch. May 22, 2014).

[132] *Matthew v. Laudamiel*, 2014 WL 5499989 (Del. Ch. Oct. 30, 2014).

[133] *Matthew v. Laudamiel*, 2014 WL 5904716, at *4 (Del. Ch. Nov. 12, 2014).

## II. CONTENTIONS

By the time of trial, Matthew maintained breach of contract, breach of fiduciary duty, conversion, and unjust enrichment claims against Laudamiel; aiding and abetting and tortious interference with contract claims against FWGSA; and civil conspiracy claims against Laudamiel, FWGSA, and DreamAir.[134] Laudamiel's counterclaims for non-material breach of contract[135] and for breach of fiduciary duty remained as well. Laudamiel did not participate in post-trial briefing, but he did appear for trial and post-trial argument. Waiver generally operates to bar issues not briefed. Nonetheless, the Court is aware of the difficulties of proceeding as a self-represented litigant and will consider FWGSA's arguments in determining whether Matthew has met his burdens to establish his claims and right to recovery.

Matthew's claims against Laudamiel, while differing in technical elements, largely seek to hold Laudamiel accountable for winding up Aeosphere and pursuing its business without him. Matthew points to earlier opinions effectively finding Laudamiel liable for breach of contract with respect to winding up and

---

[134] Pl.'s Opening Post-Trial Br. 2.

[135] While the Court in *Matthew v. Laudamiel*, 2014 WL 5499989 (Del. Ch. Oct. 30, 2014) dismissed Laudamiel's material breach counterclaims, *id.* at *2, it "[did] not dismiss claims for non-material breach which, perhaps, could justify minimal or nominal damages." *Id.* at *2 n.11. Laudamiel only sought to allege claims of material breach, but those claims fell short of material breach, arguably remaining after summary judgment as claims for non-material breach.

24

employment termination. Matthew also alleges that Laudamiel contravened the LLC Agreement's confidentiality provision. The conversion claim, too, is based on violation of the LLC Agreement (in winding up), although this contractual violation is argued to have breached Delaware's LLC Act. The fiduciary duty claims point to a self-interested effort to misappropriate the benefits of Aeosphere resulting in violations and injury broader than that addressed by the LLC Agreement. Matthew's unjust enrichment claim is similarly based on a scheme to "usurp[] Aeosphere's assets and opportunities for [Laudamiel's] personal benefit."[136] The conspiracy claims against Laudamiel (and DreamAir and FWGSA) are said to have foundation in the above theories.[137] Matthew attacks Laudamiel's counterclaims by claiming a lack of breach, simple disagreement, and lack of demonstrable, material harm.

FWGSA attempts to frame the dispute such that the LLC Agreement governs all potential recovery. Laudamiel's argument perhaps is best described as an effort to clarify and explain his conduct. He did not analyze the legal elements of Matthew's claims or his own counterclaims. Matthew's arguments in reply emphasize waiver.

---

[136] Pl.'s Opening Post-Trial Br. 35.
[137] Pl.'s Post-Trial Reply Br. 27 (identifying breach of fiduciary duty, conversion, and unjust enrichment in support of the conspiracy claims).

The theories of liability remaining against FWGSA are aiding and abetting, tortious interference, and civil conspiracy. With respect to the aiding and abetting claims, Matthew argues that Laudamiel breached his duty of loyalty by favoring personal interests, failing to deal candidly with Matthew, sharing confidential information with business partners, improperly winding up Aeosphere, terminating Matthew, and generally engaging in a scheme to remove Matthew and take Aeosphere's "most valuable assets" for his own business.[138] According to Matthew, there is enough evidence (direct and circumstantial) to find that FWGSA (through Yule) "knowingly facilitated Mr. Laudamiel's breach of trust,"[139] or engaged in a scheme to push Matthew out of Aeosphere and misappropriate the Company's assets. Matthew further draws on a number of emails to illustrate the breadth of Defendants' actions and the harm he suffered. FWGSA attacks the aiding and abetting claims by arguing that Laudamiel acted in the best interests of Aeosphere,[140] that contract claims supersede the fiduciary duty claims, that FWGSA did not knowingly act to facilitate a breach by Laudamiel, and that no damages resulted from any breach. While directly attacking the elements of the claims, FWGSA also explains Yule's actions in the overall business context.

---

[138] Pl.'s Opening Post-Trial Br. 31-32.

[139] *Id.* at 37.

[140] At oral argument, FWGSA offered that Laudamiel's conduct before winding up Aeosphere (such as engaging in communications without Matthew) should not be evaluated as interested transactions because there was no associated financial benefit. Oral Arg. Tr. 82-83.

Matthew's tortious interference claims similarly draw on direct and circumstantial evidence. The focus here, though, is on Yule's knowledge of Matthew's employment agreement and the LLC Agreement and his actions encouraging violation of those contracts. Matthew alleges that FWGSA is liable in tort because Yule encouraged Capua and Laudamiel's breaches, knowing that Matthew was a co-CEO of Aeosphere and having notice of the LLC Agreement (the latter, two days before the certificate of cancellation was filed). On the other hand, FWGSA asserts that Matthew's claims must fail because FWGSA did not know of "both the [LLC Agreement and the employment] contract[s] and the specific provision[s] allegedly interfered with,"[141] no act of FWGSA caused a breach, the Collaboration Agreement justified FWGSA's acts, and Matthew suffered no damages.

Finally, on the civil conspiracy claims, Matthew describes a conspiracy "for the ultimate purpose of misappropriating Aeosphere's assets to Mr. Matthew's exclusion, actions which were not limited to (but pre-dated and post-dated) the Company's winding up."[142] He bases the claims on Laudamiel's breach of fiduciary duty, conversion (as a statutory violation), and unjust enrichment and adds that the direct and circumstantial evidence presented at trial is sufficient to establish the conspiracy. FWGSA responds that the claims against it must fail

---

[141] Defs.' Post-Trial Answering Br. 39.

[142] Pl.'s Opening Post-Trial Br. 43.

because, similar to the aiding and abetting claims, it did not knowingly participate. It disputes the showing of any tort and explains that the members of Aeosphere made the consequential decisions, including the one to wind up Aeosphere.

Matthew's claims for damages rest on the value of his interest in Aeosphere and the value of his employment agreement. With respect to Aeosphere, the parties primarily debate whether a discounted cash flow or liquidation[143] approach better accounts for its value and, if using the former, whether Aeosphere was a start-up or early development stage company. Matthew highlights factors such as Capua's financing commitment and Aeosphere's low capital requirements, valuable contracts with established companies like FWGSA, and ability to proceed whether or not EFET materialized. In response, FWGSA emphasizes Aeosphere's cash shortage, Capua's refusal to contribute additional funds, the management conflict, and EFET's poor prospects. Related debates include the reliability of the valuation inputs, the effect of Capua's preferred units on the calculations, and the extent to which the Court may consider facts that post-date Aeosphere's dissolution. These issues account for the difference between Matthew's measure ($3,184,000) and FWGSA's measure ($0) of Matthew's ownership interest.

---

[143] Counsel for FWGSA suggested some distinction between a traditional liquidation methodology and its expert's approach. Oral Arg. Tr. 101 ("I don't think [the expert] was really performing a liquidation analysis. What he did was to say, 'I don't think this is a going concern.'"). Because the expert's approach assumed Aeosphere was not a going concern and for simplicity and convenience, the Court nonetheless refers to this approach as the liquidation approach.

Additionally, Matthew contends that he should recover the expected value of his (five-year) employment agreement ($1.4 million) because of Defendants' tortious conduct. FWGSA counters that Matthew has not shown that the alleged wrongful conduct caused the loss in payment. Rather, Aeosphere had insufficient funds to continue its operations and neither Laudamiel nor Capua was willing to act to fund Matthew's salary. The damages dispute ends with Matthew requesting pre-judgment interest for his opportunity costs, compounded quarterly, and FWGSA advocating for simple interest, if any.

## III. ANALYSIS

### A. *Legal Standard*

For Matthew to recover, he must prove his case by a preponderance of the evidence.[144] He bears the burden of proving that "certain evidence, when compared to the evidence opposed to it, has the more convincing force."[145] Laudamiel's status as a self-represented litigant is afforded some consideration, but Laudamiel chose not to submit post-trial briefing despite inclusion in the scheduling process.[146] Issues not briefed are "generally" considered waived.[147]

---

[144] *See Estate of Osborn ex rel. Osborn v. Kemp*, 2009 WL 2586783, at *4 (Del. Ch. Aug. 20, 2009) ("Typically, in a post-trial opinion, the court evaluates the parties' claims using a preponderance of the evidence standard."), *aff'd*, 991 A.2d 1153 (Del. 2010).

[145] *In re Mobilactive Media, LLC*, 2013 WL 297950, at *9 (Del. Ch. Jan. 25, 2013) (internal quotation marks omitted).

[146] *See* Oral Arg. Tr. 3-5.

Thus, the Court deals with the claims against Laudamiel for completeness and largely to determine FWGSA's liability. Because Matthew needs to support his claims for damages, FWGSA's counter-presentation will be considered broadly.

B. *The Direct Claims*

    1. <u>Contract Claims</u>

Earlier opinions largely dictate the result on Matthew's contract claims, and the Court need not belabor the point here. In June 2012, the Court held that section 5.2.6(b)(iii) of the LLC Agreement required a unanimous vote to wind up Aeosphere.[148] Although not specifically the subject of that opinion, sections 5.2.6(b)(i) and (ii) fall under the same umbrella: a unanimous vote was required to terminate Matthew's employment agreement and dispose Aeosphere's assets.[149] Matthew did not vote to terminate his employment agreement, wind up Aeosphere, or divide the assets. There is also an allegation that Laudamiel breached Section 10.10 of the LLC Agreement, which prohibited use and disclosure of "financial or business data, . . . contracts or agreements entered into by or on behalf of [Aeosphere,] or other proprietary information."[150] Laudamiel

---

[147] *See Del. Transit Corp. v. Amalgamated Transit Union Local 842*, 34 A.3d 1064, 1068 n.4 (Del. 2011).

[148] *Matthew v. Laudamiel*, 2012 WL 2580572, at *8 (Del. Ch. June 29, 2012).

[149] *Id.* ("The only reasonable interpretation of § 5.2.6(b) is that it required the approval of all three Managers to approve the enumerated actions.").

[150] LLC Agreement § 10.10. In the Pretrial Stipulation and Order, Matthew raised the question of whether the emergency meeting was properly called. Stip. § III.A

undoubtedly shared information about separation discussions with FWGSA. He sought Yule's help to push along confidential separation negotiations. The question then, foreshadowed in the Court's June 2012 opinion, is whether Laudamiel "prevail[s] on one of [his] affirmative defenses or Matthew is unable to prove that he suffered any damages."[151]

The Court provided a partial answer in an October 2014 opinion, in which it found that Matthew had not committed any material breach to excuse Laudamiel's.[152] Laudamiel maintained two counterclaims leading into trial: non-material breach of contract and breach of fiduciary duty.[153] These claims generally involve "(1) acting unilaterally without approval; (2) failing to agree on or approve various contracts or courses of action for Aeosphere; and (3) failing to attend important meetings and events."[154] Laudamiel did not participate in post-trial briefing, but at post-trial oral argument he noted Matthew's failure to bring in clients as promised, a neglect of responsibility to prepare a business plan, and a

---

¶ 4. This issue was not developed in the post-trial briefing, and any violation would not materially affect Matthew's recovery.

[151] *Matthew v. Laudamiel*, 2012 WL 2580572, at *8 (Del. Ch. June 29, 2012). The Court declined to grant Matthew's motion for summary judgment on his conversion claim (based on breach of the LLC Agreement) for the same reasons. *Id.* at *11.

[152] *Matthew v. Laudamiel*, 2014 WL 5499989 (Del. Ch. Oct. 30, 2014).

[153] Def. Christophe Laudamiel's Verified Answer to Fourth Am. Verified Compl. and Countercls. ¶¶ 111-18.

[154] *Matthew v. Laudamiel*, 2014 WL 5499989, at *2 (Del. Ch. Oct. 30, 2014).

general sentiment that Matthew "killed" projects.[155] The Court acknowledges the difficulty of proceeding as a self-represented litigant (and in a foreign language), but, as Matthew observes, Laudamiel has neither substantiated that the "harm" was more than legitimate disagreement between business partners nor proved losses from Matthew's conduct.[156]

The Court discusses damages below. For present purposes, the Court observes that Matthew has only supported claims for his ownership interest in Aeosphere and compensation under his employment agreement.[157] In his Opening Post-Trial Brief, Matthew does mention that he "should be granted equitable restitution for Mr. Laudamiel's unjust enrichment (or, alternatively, the imposition of a constructive trust over any future income Mr. Laudamiel and DreamAir will receive by reason of their wrongful conduct)."[158] His focus, however, is on the value of his units and his employment agreement, and he has not demonstrated

---

[155] Oral Arg. Tr. 108-09. He also briefly mentioned that Matthew would discuss projects with Yule alone, but he "had no problem with [that]." *Id.* at 107.

[156] *See* Pl.'s Opening Post-Trial Br. 56-57 (incorporating Pl.'s Opening Pre-Trial Br. 28-33, 56-59).

[157] The Joint Pre-Trial Stipulation and Order asks for an injunction against use of Aeosphere's assets, an order for an accounting, a constructive trust, and attorneys' fees and costs. Matthew does not seriously develop these claims in his post-trial briefing. Furthermore, Matthew has not convinced the Court to award attorneys' fees against Laudamiel, a self-represented litigant.

[158] Pl.'s Opening Post-Trial Br. 35.

enrichment beyond the value captured by his share of Aeosphere.[159]  This point is significant because Matthew cannot recover multiple times on his various theories. The Court is satisfied that Matthew's showing on the breach of contract claims supports any damages that he can prove from the unlawful winding up of Aeosphere and termination of his employment agreement.[160]

## 2. Non-Contract Claims

The Court analyzes Matthew's non-contract claims against Laudamiel (breach of fiduciary duty, conversion, and unjust enrichment[161]) because of their potential impact on FWGSA's liability.  Matthew's fiduciary duty claims look to Laudamiel's conduct over the entirety of the Aeosphere-FWGSA relationship, with the winding up just one (though a "critical"[162]) step along the way.  In addition, Matthew alleges a breach of loyalty by the very acts of improperly winding up Aeosphere[163] and failing in his "obligation to deal candidly" with Matthew.[164] FWGSA frames the dispute as one about discrete acts associated with violations of

---

[159] *Cf.* Pl.'s Opening Pre-Trial Br. 52 ("*To the extent* the Court may find after trial that Mr. Matthew cannot adequately be compensated by an award of damages, equitable restitution for unjust enrichment is appropriate." (emphasis added)).  An award of damages accounting for the value of the intellectual property taken should adequately compensate Matthew.

[160] The argument for different remedies for tort and contract is discussed in the context of damages, *infra*.

[161] The conspiracy claims are said to rest on these three underlying claims and are addressed in more detail in connection with the claims against FWGSA.

[162] Pl.'s Post-Trial Reply Br. 1.

[163] *Id.* at 25 n.6.

[164] Pl.'s Opening Post-Trial Br. 31 (internal quotation marks omitted).

Sections 5.2.6(b)(i)-(iii), 9.3, and 10.10 of the LLC Agreement—namely firing Matthew, distributing Aeosphere's assets, winding up Aeosphere, and disclosing confidential information.[165]

Laudamiel breached his fiduciary duties if he acted for a purpose other than to promote the best interests of Aeosphere.[166] Except for general arguments that the scent-related intellectual property rights he took were worthless to Matthew[167] and that it was impossible to conduct business with Matthew, Laudamiel has not defended against Matthew's claim of disloyalty in the winding up process, distributing Aeosphere's assets in a way that would facilitate future scenting work, creating DreamAir, and filing the termination paperwork on May 12. Although the DreamAir-FWGSA partnership did not prove profitable, the Court cannot find that Laudamiel did not act in anticipation that it would. Laudamiel shared confidential information and, though often for the benefit of Aeosphere's business, some of that sharing went toward asking for help in manipulating the negotiation process. Matthew has met the prima facie requirements for fiduciary duty claims. These

---

[165] *See, e.g.*, Defs.' Post-Trial Answering Br. 35-36 (arguing that the contract claims bar the fiduciary duty claims); *id.* at 44 n.7 (noting "the primacy of contract theory").

[166] "The duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders generally." *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 33 (Del. Ch. 2014) (alterations and internal quotation marks omitted). Although Laudamiel was a director of an LLC, no one disputes that he owed fiduciary duties to Aeosphere.

[167] Oral Arg. Tr. 111-12.

claims remain to the extent that they might facilitate recovery against FWGSA.[168]

Matthew has not shown injury independent of that subsumed by the contract or the fiduciary duty claims (and their indirect causes of action discussed below), and the Court need not address the conversion claims and the unjust enrichment claims in detail.[169]

## C. *The Indirect Claims*

### 1. The Aiding and Abetting Claims

As relevant in light of the above, Matthew argues that the evidence shows conduct "so suspect" that the Court can find that FWGSA knowingly participated in Laudamiel's breach of fiduciary duty.[170] The elements of an aiding and abetting claim are "(1) the existence of a fiduciary relationship, (2) the fiduciary breached

---

[168] The Court is not deciding that every breach of contract that involves some planning or discussion supports a fiduciary duty claim. The facts here show months of discussions, combined with potential pecuniary interests. These claims might have been dismissed if Laudamiel had retained an attorney, but the Court will not act on such speculation.

[169] The conversion claim involves unlawfully depriving Matthew of his units, covered by damages the Court will award for the violation of LLC Agreement § 5.2.6(b)(iii). The Court notes, without deciding, that it seems circular to find an independent statutory claim for violating a contract, based on the LLC Act's facilitation of private ordering. *See* Pl.'s Opening Post-Trial Br. 34 (invoking 6 *Del. C.* § 18-801(a)(1)-(2)).

The unjust enrichment claims were based on "the unlawful winding up of Aeosphere, which represented the culmination of . . . [the] scheme . . . to remove Mr. Matthew . . . , for the purpose of usurping Aeosphere's assets and opportunities for [Laudamiel's] benefit," rather than an injury independent of that already discussed. *Id.* at 35. *See also supra* note 159.

[170] Pl.'s Opening Post-Trial Br. 37.

its duty, (3) a nonfiduciary defendant knowingly participated in a breach, and (4) damages to the plaintiff resulted from the concerted action of the fiduciary and nonfiduciary."[171] The Court does not require a figurative smoking gun, and knowledge can be inferred under circumstances where conduct is particularly suspect.[172] Knowing participation requires a showing "that the nonfiduciary act[ed] with the knowledge that the conduct advocated or assisted constitutes such a breach."[173]

Matthew characterizes Yule's wrongdoing as "an executive at . . . a contractual partner of Aeosphere[] interject[ing] himself into an internal dispute within the company."[174] Matthew's analysis of Yule's knowledge, accordingly, looks to the "overall course of conduct with the motive and objective of removing

---

[171] *Triton Constr. Co. v. E. Shore Elec. Servs., Inc.*, 2009 WL 1387115, at *16 (Del. Ch. May 18, 2009), *aff'd*, 988 A.2d 938 (Del. 2010) (TABLE).

[172] *Id.*

[173] *Id.* As the Court explains in a footnote in *Hexion Specialty Chemicals, Inc. v. Huntsman Corp.*, the requirement to show knowledge in an aiding and abetting claim is important to "facilitate[] the commercial interaction of corporate entities." 965 A.2d 715, 747 n.88 (Del. Ch. 2008). The alternative would produce an undesirable result: "whether a particular act by a board constitutes a breach of fiduciary duty is highly context specific, such third-parties would have to undertake extensive due diligence in order to assure themselves that the board had not breached a duty in authorizing the transaction." *Id.*

[174] Oral Arg. Tr. 16. Matthew also specifies that Yule went too far by "assisting one side in that dispute, . . . facilitating their knowledge, [and] creating an imbalance in the knowledge between Mr. Matthew and the adverse parties." *Id.* at 23.

36

Mr. Matthew from Aeosphere."[175]  Although parts of the story remain unclear, the Court can find with confidence that Yule did not know until after the May 4 vote that Capua's and Laudamiel's actions would be improper and that early May is a proper focal point for determining FWGSA's liability.  Further discussion of the facts is warranted, especially to explain why the Court does not find a broad and longstanding scheme to wind up Aeosphere.

Matthew begins his Opening Post-Trial Brief by discussing the events of October 2009.  By then, Aeosphere's members were considering separate divisions of, and roles within, Aeosphere.  Over the following months, Matthew was excluded from meetings and communication.  By February, Capua and Matthew were discussing a split of the company and had retained counsel, signifying the seriousness of their attempt to resolve the problems.  An email from April 7 suggests that Matthew had decided to walk away from negotiations, but the negotiations continued.  Capua has asserted that Matthew's April 23 email was the final straw.[176]  Capua claims to have consulted his counsel at that point and to have decided to dissolve Aeosphere.

Yule, of course, played some role in the managers' dispute, as the email record proves.  Matthew did not authorize discussions of internal affairs, but both sides asked Yule for help to a certain degree.  Yule was not opposed to working

---

[175] *Id.* at 20.
[176] *Id.* at 76-77; JX 39.

with Matthew, although Yule stated that Laudamiel provided more value to the collaboration. Yule also told at least one business partner about Aeosphere's management difficulties. On April 28, Laudamiel informed Yule about the "Commando Operation" through an email asking for more time to review certain terms with Prolitec and mentioning unexpectedly "find[ing] the jungle in New York."[177] It was not until May 10, however, only two days before the certificate of cancellation was filed, that Yule received from Matthew actual notice that Capua and Laudamiel possibly violated the LLC Agreement.[178]

One could argue that the negotiations for a mutual agreement on splitting Aeosphere were pretextual and part of a bigger secret plan, of which Yule knew early on. Nonetheless, evidence of continued business through months of negotiations and the eventual involvement of counsel makes Defendants' position the more probable.[179] A longstanding scheme to push someone out and steal assets is not consistent with spending months in negotiations with that person and

---

[177] JX 158 at FWGSA 010215. Laudamiel contends that the dissolution decision came in May, Oral Arg. Tr. 106, but a privilege log entry discussed at trial suggests that Laudamiel was aware of a preliminary agenda for the emergency meeting by April 29. Trial Tr. vol. III, 712-14 (Laudamiel).

[178] Oral Arg. Tr. 87-88; JX 48 at FWGSA 096730.

[179] Matthew argues that the Court can infer knowledge or rely on circumstantial evidence in support of his various claims. Circumstantial evidence can prove a fact if the fact "follows as a natural or very probable conclusion from the facts actually proven." *In re Purported Last Will & Testament of Langmeier*, 466 A.2d 386, 402 (Del. Ch. 1983). The Court reaches its factual conclusions with this authority in mind.

notifying him of a meeting at which he could vote in opposition.[180]  The July 28 email from Capua pleading that Yule "not forget about [DreamAir]" and the Collaboration Agreement markup offer further support.  If Capua, Laudamiel, and Yule contrived to take the Scent Project for themselves, Capua should not have had to implore Yule to move forward with the DreamAir-FWGSA relationship.  The agreement Yule proposed would likely not have avoided concrete terms.

At most, the Court can find that Laudamiel and Capua formed a plan, by late April, to engage in a "Commando Operation" of withdrawing cash[181] and calling an emergency meeting to pursue, among other items, dissolution.[182]  Yule's (literally fitting) response to the "Commando Operation" email, imagining Laudamiel "crawling through the undergrowth in . . . camo-paint,"[183] suggests that he was clueless about Laudamiel's intentions (but was trying to be socially responsive).[184]  That Yule was involved in confidential communications and clearly favored Laudamiel does not lead to a natural or probable conclusion that he

---

[180] Matthew had notice but chose not to participate in the May 4, 2010, meeting. JX 110 at LCA 001576 (emergency meeting minutes).

[181] JX 158.

[182] JX 109.

[183] JX 158 at FWGSA 010215.

[184] Yule's email said, "Good luck with the raid!"  *Id*.  Yet it does not make sense that Yule would send Laudamiel a "rush" request to read and comment on "Flaktwoods – Prolitec business terms" if he knew that Laudamiel was occupied with a crucial part of their alleged scheme.  *See id.* at FWGSA 010215-16.

knew about the emergency meeting and that Capua and Laudamiel would engage in wrongful conduct.

By May 10, Yule knew that Matthew thought the winding up had been conducted unlawfully. That said, there is no direct evidence that Yule knew he was advocating wrongdoing by pushing the parties to resolve their differences,[185] and his actions between May 4 and 12[186] are not so suspect that the Court can infer knowing participation in the illicit winding up effort.[187] At most, Yule emailed business partners (who had previously received notice of the winding up on May 5), asked for documentation that Aeosphere was no longer in business,[188] and invited Laudamiel to join a conference call (sometime between May 12 and 13).[189] Yule walked the line by expressing his opinions throughout the entire Aeosphere-

---

[185] Yule testified that he had never received a copy of the LLC Agreement. Trial Tr. vol. II, 479, 501 (Yule). On cross examination, he was questioned about the extent of his knowledge of Laudamiel's employment rights, but not his lack of receipt. *See* Trial Tr. vol. III, 653-56 (Yule). The Court does not seek to create an insurmountable burden of due diligence in commercial transactions with third parties by requiring in depth knowledge of all governing documents to avoid contributing to a potential breach.

[186] Once the certificate of cancellation was filed on May 12, Capua and Laudamiel no longer owed fiduciary duties to Aeosphere. *See Comerica Bank v. Global Payments Direct, Inc.*, 2014 WL 3779025, at *14 n.120 (Del. Ch. Aug. 1, 2014) (citing cases to distinguish between duties owed before and after termination of a joint venture).

[187] *See* Pl.'s Opening Post-Trial Br. 16-23 (reciting facts).

[188] Trial Tr. vol. II, 510-11 (Yule); *see also* JX 129 (May 12 email from Laudamiel attaching minutes from May 4).

[189] *See* JX 161 at FWGSA 010391. In a May 13 email, Yule indicates that he has invited Capua and Laudamiel to join the call. That email followed an email from May 12 in which Yule mentioned looking forward to the call.

FWGSA relationship, but the evidence does not show that he knowingly participated in a breach of fiduciary duties relating to the winding up effort.

Admittedly, there is ample evidence that Yule conveyed information about management conflict to a third party and participated in discussions about management issues to an extent unknown by (and actively concealed from) Matthew. However, Aeosphere and its members suffered no harm from these acts. It is likely that Yule had a sense of the disagreement from Matthew and Laudamiel's attempts to communicate with him on an individual basis. Despite Matthew's attempts to keep negotiations confidential, Matthew's yelling at Laudamiel at a Scent Opera venue was no secret. Yule's statement to a potential third-party partner that Matthew was soon to leave did not cause that partner to terminate relations with either FWGSA or Aeosphere.[190] If anything, the negotiations with business partners enhanced Aeosphere's profitability. Yule explained that Laudamiel was the more valuable co-CEO to FWGSA—a scenting project needs a skilled perfumer—and that appears to have been true despite Matthew's contrary personal beliefs. The Court fails to see how Yule's repeating true information is actionable misconduct. The emails do not say that Matthew must quit or be fired. Yule stated that he was willing to work with both co-CEOs. Reminding the managers that their squabbles were hurting business is generally not

---

[190] *See* JX 157 at FWGSA 009532.

objectionable. Instructing the managers to end their relationship lawfully, in the right context, is not necessarily wrongful.

Matthew's argument that Capua and Laudamiel would not have dissolved Aeosphere without assurance of Yule's support, raised in the context of the tortious interference claims, is also relevant on the point of resulting damages.[191] Capua and Laudamiel clearly valued FWGSA's support, but the inferences that can be drawn from Yule's "poor set of words"[192] do not outweigh the testimony and emails showing independent disagreement among Aeosphere's members and the escalation of the negotiations. Yule had expressed support for Laudamiel since at least October and sent his 100% commitment email in January.[193] The managers subsequently engaged in months of negotiations. Yule's belated involvement at most accelerated the already inevitable deterioration in Aeosphere's management relationships—it did not cause independent harm.[194] In sum, the aiding and abetting claims fail for lack of knowing participation and harm.

---

[191] *E.g.*, Pl.'s Post-Trial Reply Br. 27.

[192] Trial Tr. vol. II, 469 (Yule).

[193] *See* Pl.'s Opening Post-Trial Br. 4-5 (citing the October 23 email to create a scheduling conflict).

[194] The Court finds that while Yule was aware that Laudamiel and Capua were taking a hard line with Mathew, there is no indication that Yule knew prior to the dissolution meeting that unanimous approval was required to oust Matthew or that doing so without unanimous approval would violate the LLC agreement. Yule was on notice of the dissolution's impropriety only after Matthew so informed him in a post-meeting email, JX 48 at FWGSA 096730, which Yule may or may not have believed.

## 2. The Tortious Interference Claims

FWGSA's opposition to the tortious interference claims centers around whether Yule had the requisite knowledge of the LLC Agreement (and its particular provisions), the causal chain, and justification. A claim for tortious interference requires that "(1) there was a contract, (2) about which the particular defendant knew, (3) an intentional act that was a significant factor in causing the breach of contract, (4) the act was without justification, and (5) it caused injury."[195] Tortious interference involves not only knowledge that a contract exists but also intent to interfere with that contract.[196] The justification element depends on factors such as:

(a) the nature of the actor's conduct,
(b) the actor's motive,
(c) the interests of the other with which the actor's conduct interferes,
(d) the interests sought to be advanced by the actor,
(e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other,
(f) the proximity or remoteness of the actor's conduct to the interference and
(g) the relations between the parties.[197]

---

[195] *WaveDivision Hldgs., LLC v. Highland Capital Mgmt., L.P.* ("*WaveDivision II*"), 49 A.3d 1168, 1174 (Del. 2012) (internal quotation marks omitted).

[196] *NAMA Hldgs., LLC v. Related WMC LLC*, 2014 WL 6436647, at *28 (Del. Ch. Nov. 17, 2014).

[197] *WaveDivision II*, 49 A.3d at 1174 (citing Restatement (Second) of Torts § 767 (1979)).

The Court evaluates tortious interference claims, including possible justification, mindful that "some types of intentional interference with contractual relations are a legitimate part of doing business."[198]

Again, the Court starts with the premise that the potential violations are disclosure of confidential information and unlawful acts associated with winding-up, not a broad scheme. The tortious interference analysis focuses on Yule's knowledge of the LLC Agreement and attached employment contract, but the relevant facts are similar to those above. Yule had not known about the LLC Agreement (much less that Capua and Laudamiel were violating any provision of it) until May 10. As between the time of notice and the time that Laudamiel filed the certificate of cancellation (two days later), Matthew points to no act that significantly affected the filing of the certificate of cancellation or resulted in loss to Aeosphere, as discussed above.

As previously mentioned, Matthew argues that Capua would not have wound up Aeosphere if he did not have Yule's commitment to work with a new business.[199] For support, Matthew quotes a deposition passage in which Capua addressed the topic of asking Yule whether he would be willing to work with successors to Aeosphere, where Aeosphere would be divided into two companies

---

[198] *NAMA Hldgs., LLC*, 2014 WL 6436647, at \*26.
[199] Pl.'s Opening Post-Trial Br. 42 (citing Capua Dep. 115); Pl.'s Post-Trial Reply Br. 26-27.

led by Matthew and Laudamiel separately. Capua also recalled a concern that "without Flakt Woods Aeosphere would collapse."[200] At most, such facts could support an inference that Yule's support was significant in Capua's decision to wind up Aeosphere. However, Capua's conduct is not at issue, and expressing a willingness to work with two different businesses does not show that Yule knew about the LLC Agreement, intended a breach of that agreement, or acted between May 10 and 12 to effectuate such a breach. If Yule's support caused the harm of winding up Aeosphere, it would mean that Capua and Laudamiel wasted months of their time and legal fees in negotiations and in operating Aeosphere—the more likely scenario is that Capua and Laudamiel grew tired of dealing with Matthew.

With respect to the employment agreement (which was part of the LLC Agreement), Matthew alleges that there is enough evidence to find that Yule knew about it early on and intentionally interfered. He cites Yule's testimony and the Collaboration Agreement (with its amendments) that Matthew signed as co-CEO. On the other hand, Yule testified that he did not "know if [Matthew and Laudamiel] were working for Aeosphere with a salary or if they were simply shareholders and drawing dividends."[201] As FWGSA observes, the mere existence of an employment agreement does not permit a finding that an employee has a right to a term of continued employment—a number of cases addressing the

---

[200] Capua Dep. 115.
[201] Trial Tr. vol. II, 502 (Yule).

implied covenant of good faith and fair dealing recognize a presumption under Delaware law that employment contracts are "at-will in nature with duration indefinite."[202] That one can interfere without understanding the legal effect of a contract does not negate the requirement of intending to interfere with something in the first place. There is also no reason to doubt Yule's position that FWGSA would have been amenable to working with Aeosphere as two separate companies or that he hoped that "peace" would ensue. Even if there were some knowledge of a contract, Matthew has failed to establish the critical element of intent to interfere with Matthew's employment.

Additionally, FWGSA prevails on the justification element. Yule expressed that Laudamiel's skill was more valuable to FWGSA, a true statement, and did not make overt threats.[203] He did, however, exert pressure (at times prompted by Laudamiel), and there was some disingenuousness in his representation that FWGSA's board would get involved. More importantly, though, FWGSA was invested in a Collaboration Agreement that it hoped would differentiate itself from

---

[202] Defs.' Post-Trial Answering Br. 40-41 (quoting *Bailey v. City of Wilm.*, 766 A.2d 477, 480 (Del. 2001)).

[203] *See generally* Def. Fläkt Woods Group SA's Mem. of Law in Supp. of Its Mot. for Summ. J. 25-32. Matthew also incorporates earlier filings on the justification issue. *See* Pl.'s Opening Pre-Trial Br. 45-49.

the competition in the air-handling market, and therefore had a proper motive[204] (and interest[205]) in urging its business partner[206] to resolve its management disputes. FWGSA concedes that Yule's conduct interfered with valid contracts, but justification does not require all factors to be met. Finally, as noted above, the weight of the evidence is that Yule was not the deciding factor in the winding up (although Yule did cause some disclosure of confidential information for which the Court has found no independent injury). The Court cannot ignore the progression of the separation negotiations and the value of the Scent Project to FWGSA and Aeosphere. Therefore, for reasons of justification and lack of knowledge, intent, and injury, the tortious interference claims fail.

### 3. The Conspiracy Claims

FWGSA argues that the conspiracy claim must fail for the reasons the aiding and abetting claims do: namely the lack of a wrongful act, knowing participation,

---

[204] *See WaveDivision II*, 49 A.3d at 1174 ("Only if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference.").

[205] *See WaveDivision Hldgs., LLC v. Highland Capital Mgmt. L.P.* ("*WaveDivision I*"), 2012 WL 3224310, at *12 (Del. Super. Aug. 7, 2012) ("It was not improper for the defendants to interfere with the Wave Agreements in order to protect their own financial interest in Millennium."). However, both FWGSA's interest in protecting its investment in the Scent Project and Matthew's interest in his contract rights without interference by third parties were important. *See id.* at *13 (discussing "[t]he societal interests in protecting the freedom of action of the actor and the contractual interests of the other." (emphasis removed)).

[206] The parties' economic relationship weighs in favor of justifying FWGSA's involvement. *Id.*

47

and harm.[207] A claim for conspiracy requires "(1) [a] confederation or combination of two or more persons; (2) [a]n unlawful act done in furtherance of the conspiracy; and (3) [a]ctual damage."[208] Because "a plaintiff often cannot produce direct evidence of a conspiracy," circumstantial evidence can be offered as "'proof that it occurred.'"[209] Without rehashing the arguments above, the claims of FWGSA's involvement in a "conspiracy" of breaching confidentiality or excluding Matthew fail as against FWGSA because either (1) no act of Yule was in furtherance of winding up Aeosphere or (2) no actual losses resulted. There was no "confederation" involving FWGSA regarding dissolution, winding up, and terminating Matthew's employment agreement—Yule did not know about Capua and Laudamiel's plans until after their acts had occurred (and he did not cause any harm once he had notice of potential wrongdoing). The exchange of confidential information did not produce any quantifiable harm to Aeosphere or Matthew. In contrast, Matthew succeeds on his claim against DreamAir. Laudamiel acted to form DreamAir before Aeosphere's certificate of cancellation was filed, and (anyway) default judgment has been entered against DreamAir. The breaches of fiduciary duty by Laudamiel (at a minimum) support holding DreamAir responsible for the damages, discussed below, on equal footing with Laudamiel.

---

[207] Defs.' Post-Trial Answering Br. 43.

[208] *Nicolet, Inc. v. Nutt*, 525 A.2d 146, 149-50 (Del. 1987).

[209] *Reid v. Siniscalchi*, 2014 WL 6589342, at *6 (Del. Ch. Nov. 20, 2014).

Thus, Matthew's conspiracy claims succeed to the extent that he can recover (once) for his injury.

D. *Damages*

Based on the above, Matthew maintains claims for damages against Laudamiel and DreamAir but not FWGSA. Matthew seeks compensation for the value of his ownership interest in Aeosphere (the "remedy for conversion of . . . Matthew's Aeosphere membership units"[210]) and his employment agreement (the remedy for "a breach that was tortiously encouraged . . . by FWGSA"[211]). According to Matthew, these damages total $4,584,000 plus interest. Matthew must prove that he is entitled to this amount to attain his full recovery, although the Court views its task as analogous to an appraisal and will exercise discretion in determining the appropriate valuation.[212]

A few preliminary issues should be addressed. First, the Court declines to balance the qualifications of the expert witnesses, Kevin Vannucci ("Vannucci")

---

[210] Pl.'s Opening Post-Trial Br. 44.

[211] *Id.* at 55. In the reply brief, Matthew frames the issue as a remedy for tortious interference, which the Court has already rejected. The Court will, however, consider the value of the employment contract for thoroughness and to address any lingering concern about Laudamiel's liability.

[212] *See Montgomery Cellular Hldg. Co. v. Dobler*, 880 A.2d 206, 221 (Del. 2005) ("In a statutory appraisal proceeding, each side has the burden of proving its respective valuation positions by a preponderance of the evidence. Even if one side fails to satisfy its burden, the Court . . . must use its own independent judgment to determine fair value." (footnote omitted)). Again, the Court will consider FWGSA's damages arguments broadly.

for Matthew and G. Matt Barberich, Jr. ("Barberich") for FWGSA, other than to note that they were sufficient to present opinions at trial. Second, the parties do not argue that the LLC Agreement offers a standard for determining damages for a breach, although Section 9.3 governs how payments are to be made after dissolution. Third, consistent with an appraisal, the Court does not factor in events or facts unknowable as of the relevant date for valuation purposes, here May 12, 2010.[213] Finally, the Court has not sought out the details of Matthew's settlement with Capua, but Matthew cannot recover twice for the same harm.

Amidst the debate over whether Aeosphere should be considered a going concern or should be treated as if it had been liquidated,[214] the Court is convinced that neither side's account presents the entire story. If Aeosphere were worthless, it does not make sense that Laudamiel would specifically assign himself

---

[213] *See, e.g.*, *Gearreald v. Just Care, Inc.*, 2012 WL 1569818, at *5 (Del. Ch. Apr. 30, 2012) ("The Court should consider all factors known or knowable as of the Merger Date that relate to the future prospects of the Companies, but should avoid including speculative costs or revenues." (internal quotation marks omitted)).
[214] FWGSA argues that a discounted cash flow method does not produce a useable result in Aeosphere's case because it is not a going concern, it lacks a history of revenues, and lacks reliable inputs. *See, e.g.*, Defs. Fläkt Woods Group SA and Fläkt Woods Limited's Mem. in Further Supp. of Their Mot. In Limine to Preclude Testimony of Kevin Vannucci 4-6. Another problem is that it is difficult to place a value on specific Aeosphere assets, such as the Scent Opera, but that does not appear to have inflated Vannucci's calculations. Matthew contends that "this Court has not applied a liquidation-based valuation . . . to appraise equity shares." Pl.'s Post-Trial Reply Br. 31. He also raises concerns that using liquidation value "incentivize[s] fiduciaries to simply pursue dissolution of an entity and transfer its liquidated assets to a new business rather than through a merger that might trigger appraisal rights." Oral Arg. Tr. 44-45.

intellectual property and continue to work on a modified version of the Scent Project. On the other hand, the EFET system was not marketable by May 2010, reducing Aeosphere's potential for profitability.

The entirety of the financial and other evidence demonstrates that Aeosphere was in dire financial straits. The Company could not even afford to pay Matthew and Laudamiel, its own co-CEOs, given its inadequate cash flow. The business continued to suffer as the co-CEOs failed to cooperate. Further, Aeosphere had considerable debt and at best a suboptimal product to sell. No evidence existed of any potential investor other than Capua, and by all accounts Capua refused to commit additional capital.[215] Finally, if one makes the generous assumption that Aeosphere's cash burn rate was $30,000 per month (based in part on the co-CEOs foregoing salaries),[216] its bank account would have sustained operations for only another five to six months. There was some subjective optimism about EFET, though successful adaption of the technology to the commercial context was far from certain and never in fact materialized. As mentioned, Vannucci's cash flow projections assumed a viable EFET product, and were prepared by individuals

---

[215] Aeosphere might have had a breach of contract claim, but that would not be a source of immediate and reliable funding to continue its operations.

[216] The Court adopts this number for hypothetical purposes only. This figure is part of what Vannucci considered when determining that Aeosphere could be valued as a going concern. *See* Trial Tr. vol. IV, 990-91, 994-96 (Vannucci).

motivated to promote Aeosphere.  For these reasons, the Court cannot adopt Vannucci's valuation wholesale.

The liquidation approach is also imperfect because it does not address the Court's concerns about the distribution of Aeosphere's assets—particularly its intangible assets.  Barberich's analysis worked off of the closing balance sheet in Vannucci's report,[217] and the value of the Scent Project was not included in the balance sheet.[218]

As noted above, Aeosphere was running on fumes, and hindsight proves that the Scent Project (never able to use EFET) was not profitable.  At the time of the winding up, however, Aeosphere, despite its troubles, was a going concern with value in its intellectual property and potentially lucrative contracts with well-established entities such as FWGSA.  Recognizing that Aeosphere had some value as a going concern, but mindful of the speculative nature of Aeosphere's product and future cash flows, the Court adopts Vannucci's discounted cash flow model with a reduced enterprise value and allocates a 35% interest to Matthew.

---

[217] JX 287 at 4 (explaining that Barberich would temper Vannucci's "aggressive" calculations but emphasizing that even Vannucci's balance sheet shows that Aeosphere "had no value").
[218] *See* JX 434 at Schedule 1 & n.4.

Vannucci, in his valuation, utilized venture capital rates of return for purposes of selecting a discount rate.[219] In making this selection, Vannucci's first task was to classify Aeosphere into one of five stages of development, each of which is designated a distinct range of potential discount rates.[220] The first stage, a start-up stage investment, is one in which "[t]he venture funding is to be used substantially for product development, prototype testing, and test marketing."[221] The second stage, an early development stage investment, is one "made in companies that have developed prototypes that appear viable and for which further technical risk is deemed minimal."[222]

In classifying Aeosphere, the Court considers the following facts: First, Aeosphere had been in business for over a year, had contracts of value, and held some expectation that the Prolitec technology would suffice until EFET became marketable. Second, the parties were clearly interested in EFET, and Laudamiel and Capua did not just walk away from Aeosphere. Third, while Vannucci's valuation utilized projected cash flows assuming a viable EFET technology, the Court's calculation considers EFET a mere expectancy and assumes use of the

---

[219] Trial Tr. vol. IV, 1003 (Vannucci) (reasoning that Aeosphere's youth renders the CAPM less reliable than the established "VC rates of return"); JX 434 at Schedule 4.

[220] Trial Tr. vol. IV, 1005-06 (Vannucci).

[221] JX 287 at 32. Potentially acceptable discount rates for a start-up stage investment range from 50% to 125%. JX 434 at Schedule 4.

[222] JX 287 at 33. Potentially acceptable discount rates for an early development stage investment range from 40% to 70%. JX 434 at Schedule 4.

then-viable Prolitec technology.[223]  Given these facts, Aeosphere can reasonably be considered an early development stage company.  The Court, therefore, adopts Vannucci's discount rates—40% for the FWGSA projections and 50% for the Aeosphere projections—both of which fall within the range of acceptable rates for an early development stage company.[224]

Vannucci's free cash flow inputs, however, assumed a viable EFET technology, and were therefore inflated.[225]  To compensate, the Court, in its independent valuation, reduced the free cash flows to one-fifth of their projected value.[226]  This reduction is consistent with Yule's testimony regarding the value of the scenting project absent viable EFET technology.[227]  Yule, however, further stated that if the Prolitec relationship was not exclusive (which it was not[228]), the

---

[223] This fact is relevant because Prolitec was an existing technology that "appear[ed] viable"—even though its use would presumably reduce margins relative to the yet unperfected EFET technology—further justifying Aeosphere's "early development" classification.

[224] JX 434 at Schedule 4.

[225] While the Court adopts Vannucci's valuation model and discount rates, the Court finds credible Yule's testimony regarding the appropriate cash flow reduction to compensate for the uncertainty surrounding EFET.

[226] By simply reducing Aeosphere's free cash flows, as opposed to adjusting its revenue and expenses independently, the Court assumes that Aeosphere's cost of goods sold and operating expenses vary proportionately to sales.  Such an assumption is not unreasonable in light of the fact that "Aeosphere, on its own, was not a capital-intensive company," and therefore incurred relatively few fixed costs, resulting in an unlevered cost structure.  Trial Tr. vol. IV, 995 (Vannucci).

[227] Trial Tr. vol. II, 428 (Yule) (stating that projections assuming Prolitec technology would be one-fifth to one-tenth of those assuming EFET).

[228] *Id.* at 428, 524 (Yule).

projections "would drop again by a factor of about ten."[229]  In hindsight, therefore, the adjusted projections could reasonably be reduced to as little as two percent of the originals.[230]

The Court's decision to reduce the projected free cash flows to one-fifth, as opposed to some lesser value between one-fifth and one-fiftieth, is deliberate.  At the time of the valuation, the EFET technology lingered as a possibility.  Therefore, the projected free cash flow, while assuming the use of Prolitec technology, must also incorporate the expected value of the EFET technology as of the time of the valuation.  The Court incorporates such value by reducing the projected free cash flows by the minimum factor suggested by Yule, as opposed to reducing them further given the lack of an exclusive agreement with Prolitec.[231]  The possibility that EFET-based products could be ready to sell within a year of a successful test is further counterbalanced by the improbability that the co-managers would have outlasted the testing.

---

[229] *Id.* at 428 (Yule).

[230] The Court reaches this figure by reducing the above one-fifth by the additional ninety percent suggested by Yule given the lack of an exclusive agreement with Prolitec.  The Court notes, however, that a reasonable interpretation of Yule's testimony could result in a finding of one percent of the original projections.  *Id.* (Yule stating that projections assuming Prolitec could be as low as ten percent of those assuming EFET; reducing that amount by a "factor of . . . ten" results in projections at one percent of the originals).

[231] The Court notes, however, that without additional data, equating the expected value of the EFET technology at the time of the valuation to the value added by reducing cash flows by a mere 80% is somewhat of a rough estimate.

Applying the 40% and 50% discount rates respectively to FWGSA's and Aeosphere's adjusted free cash flow projections results in a weighted[232] value of $1,908,066.56 for the Scent Project.[233] Accounting for cash and cash equivalents, working capital, and non-operating assets[234] brings Aeosphere's enterprise value to $1,405,256.56. The total value of Matthew's 35% share, treating all units equally, is therefore $491,839.79. Capua's preferred units had a liquidation preference and a preferred return, but the Court cannot find with confidence that those rights should be afforded any material value: the winding up was wrongful and the prospect of repayment in the face of Aeosphere's many struggles is too speculative. Matthew had a 35% interest in Aeosphere and the right not to have it wound up without his approval. Although it is difficult to discern the value of an idea, and reasonable minds could disagree, the Court reaches this result with some level of comfort.

---

[232] The Court adopts Vannucci's weights of 60% for the FWGSA projections and 40% for the Aeosphere projections. JX 434 at Schedule 1 n.1 (Valuation Synthesis and Conclusion).

[233] While Vannucci's calculations primarily consider the Scent Project, Dep. Trs. of Kevin Vannucci ("Vannucci Dep.") 66-68, Aeosphere's portfolio of business opportunities contained sundry additional projects. JX 285 at 3. Vannucci, however, stated that any projected cash flows for such additional projects would be "too speculative" to include in the valuation model. Vannucci Dep. 67. Thus, the value of Aeosphere represented by Vannucci's and the Court's calculations stems primarily from the Scent Project.

[234] JX 434 at Schedule 1.

Matthew appears to base his claim for damages from his employment contract on tortious interference. He has failed to prove that claim against FWGSA, but the question of Laudamiel's and DreamAir's liability lingers. Matthew argues that he should receive the remainder of his pay under his five-year contract because the remedy for a tort is what he expected, not simply what Aeosphere would have paid. The Court rejects this argument because Matthew's compensation was not reduced by any wrongful act; Matthew's employment contract had a five-year term, but Matthew and Laudamiel had been deferring salaries since at least May 2009.[235] Capua and Laudamiel likely would not have authorized additional payments, and Matthew has not provided a basis for the Court to find that Aeosphere's cash flow would improve. Importantly, the Court's willingness to accept a discounted cash flow valuation in the first place rests in part on the co-CEOs' willingness to forgo compensation so that Aeosphere could remain a going concern.[236] Thus, Matthew has not demonstrated that he is separately entitled to damages for the termination of his employment contract.

---

[235] Trial Tr. vol. I, 88 (Matthew).

[236] Matthew supports his expert's valuation by observing Capua's commitment to fund salaries. Pl.'s Opening Post-Trial Br. 48-49. Capua would not have done so. If the Court accepts that Aeosphere was a going concern despite its inability to make payroll, it is fair to assume that Matthew would not have continued to work without compensation.

E. *Other Matters*

If the implementing order establishes that DreamAir owes any amount to Matthew, it shall respond to the motion to compel. Matthew has not provided a basis for shifting attorneys' fees to overcome the American Rule. Pre-judgment interest and post-judgment interest compounded quarterly at the statutory rate fairly compensate Matthew.

## IV. CONCLUSION

For the reasons discussed above, the Court awards Matthew $491,839.79 from Laudamiel and DreamAir for the unlawful winding up of Aeosphere, subject to a determination of the effect of the Capua and Action 1 settlement reached by Matthew.[237] The interested parties shall address this issue. Judgment will be entered in favor of FWGSA and FWL and against Matthew.[238]

Entry of an implementing order will await, in the absence of a request from any party, a conclusion regarding the effect of the earlier settlement.

---

[237] The Court has chosen to reach this decision without being aware of the amount for which Capua and Action 1 settled.

[238] The pre-trial order does not squarely address FWGSA's cross-claims. Nonetheless, with this conclusion, the cross-claims of FWGSA are moot and, thus, are dismissed.